**[Cite as *State v. Warren*, 2020-Ohio-6990.]**

STATE OF OHIO      )          IN THE COURT OF APPEALS
                   )ss:      NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

STATE OF OHIO                    C.A. No.     29455

    Appellee

    v.                            APPEAL FROM JUDGMENT
                               ENTERED IN THE
ANDRE ANTHONY WARREN        COURT OF COMMON PLEAS
                               COUNTY OF SUMMIT, OHIO
    Appellant                 CASE No.    CR 18 08 2831(A)

DECISION AND JOURNAL ENTRY

Dated: December 31, 2020

---

TEODOSIO, Judge.

{¶1}  Appellant, Andre Anthony Warren, appeals from his convictions for murder and felonious assault in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}  Mr. Warren took his 4-year-old son to Julian's restaurant in Akron for breakfast on July 1, 2018.  Another man ("S.R.") was eating breakfast alone while seated at a booth inside.  Mr. Warren approached S.R. and engaged him in a verbal argument.  Mr. Warren then exited the restaurant and made two phone calls, one to his son's mother ("S.S.") to come pick up their child and the other possibly to his co-defendant in this case ("B.E."), although at trial Mr. Warren denied calling B.E.  Within minutes, S.S. arrived and took the young boy with her.  Mr. Warren placed a to-go order and then sat on a chair inside the restaurant, near the front door and facing S.R.  B.E. soon arrived and entered the restaurant, making brief contact with Mr. Warren before immediately leaving to wait outside.

{¶3} Three other individuals ("T.B., M.S., and D.T.") arrived at the restaurant together in the same vehicle, purportedly to eat breakfast. T.B. and M.S. were dating each other at the time, while M.S. and D.T. are both cousins with S.R. The trio arrived almost simultaneously with Mr. Warren receiving his food, exiting the restaurant, and walking to his vehicle in the side parking lot, with B.E. falling in behind him. As T.B. and D.T. exited their vehicle and walked to its rear, Mr. Warren drew his revolver and opened fire on them, hitting the vehicle and both men. D.T. was still alive and struggling to take cover after being shot three times, but one of the bullets had already injured his lungs and heart, causing significant internal bleeding, and was later determined to be fatal. T.B. was shot once in the groin area. B.E. also began shooting at the victims and soon pursued the wounded D.T. around the vehicle while shooting at him, hitting him four more times in the back. T.B. survived the incident, but D.T. did not.

{¶4} Mr. Warren quickly fled the scene in his vehicle, while B.E. fled on foot to his own vehicle parked somewhere nearby. Both men drove away in the same direction and both ran the same stop sign one block north of the restaurant. Mr. Warren made it through the intersection unscathed, but B.E. crashed his vehicle into the vehicle of a 54-year-old woman and her 11-year-old niece who were on their way to church. Mr. Warren stopped and helped B.E. quickly transfer certain items from B.E.'s now disabled vehicle into Mr. Warren's vehicle. An eyewitness who lived nearby recalled seeing both men laughing at the time. The two men then fled the scene of the collision together in Mr. Warren's vehicle. Mr. Warren was on post-release control for felony domestic violence at the time and was subject to GPS monitoring. Still only minutes removed from the shooting incident, he cut off and discarded his ankle bracelet. Mr. Warren also admitted to disposing of his gun, which was never found.

{¶5} Mr. Warren and B.E. were indicted as co-defendants in this matter. Mr. Warren was charged with two counts of murder with firearm specifications, three counts of felonious assault with firearm specifications, one count of having a weapon while under disability, and one count of escape. The escape charge was later dismissed. A supplemental indictment was also filed, charging him with one count of escape and one count of carrying a concealed weapon. Following a jury trial, Mr. Warren was convicted of all charges except the felonious assault of M.S. The trial court merged one count of murder, one count of felonious assault, and the attendant firearm specifications into the remaining count of murder for purposes of sentencing, and then sentenced Mr. Warren to an aggregate total of 29 years to life in prison.

{¶6} Mr. Warren now appeals from his convictions and raises two assignments of error for this Court's review.

## II.

### ASSIGNMENT OF ERROR ONE

DEFENDANT-APPELLANT WARREN'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶7} In his first assignment of error, Mr. Warren argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. Although sufficiency and manifest weight are two separate, legally distinct arguments and should be argued separately, he has chosen to argue them together in his brief, and we will therefore address them together. *See, e.g., State v. Gilbert*, 9th Dist. Lorain No. 17CA011209, 2018-Ohio-1883, ¶ 5; *State v. Dean*, 9th Dist. Lorain No. 18CA011290, 2019-Ohio-1391, ¶ 5. In his merit brief, Mr. Warren explicitly limits this assignment of error to challenging his convictions for the murder and felonious assault of D.T., and we will likewise limit our analysis to those two convictions.

{¶8}     Whether a conviction is supported by sufficient evidence is a question of law, which this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "A challenge to the sufficiency of the evidence concerns the State's burden of production * * *" and is, "[i]n essence, * * * a test of adequacy." *In re R.H.*, 9th Dist. Summit No. 28319, 2017-Ohio-7852, ¶ 25; *Thompkins* at 386. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. However, "we do not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact." *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

{¶9}     A challenge to the manifest weight of the evidence, however, concerns the State's "burden of persuasion" and "whether the greater amount of credible evidence produced at trial supports one side over the other side." *In re R.H.* at ¶ 25-26, citing *Thompkins* at 387 and 390. When reviewing a manifest weight challenge,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the

conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶10} Mr. Warren was convicted of murder, in violation of R.C. 2903.02(A), which prohibits "purposely caus[ing] the death of another * * *." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A). He was also convicted of felonious assault, in violation of R.C. 2903.11(A)(2), which prohibits "knowingly * * * [causing] or attempt[ing] to cause physical harm to another * * * by means of a deadly weapon * * *." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "Physical harm to persons" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A "deadly weapon" is "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon[,]" R.C. 2923.11(A), which includes firearms, *see* R.C. 2923.11(B)(1).

{¶11} Mr. Warren has never disputed the fact that he shot D.T. He instead argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense and that his convictions for murder and felonious assault are against the manifest weight of the evidence because "[t]he jury clearly lost [its] way in deciding whether the State proved beyond a reasonable doubt that [he] did not act in self-defense." His self-defense argument at trial was supported primarily by his own testimony that he feared D.T. based on a past shooting incident and past threats, and that he saw D.T. reaching for a gun on July 1, 2018.

{¶12} Self-defense requires that a defendant: (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. All three of these elements must be present to establish self-defense. *State v. Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 10. In the past, Ohio law required this affirmative defense to be proven by a defendant by a preponderance of the evidence. *Id.*; Former R.C. 2901.05(A). Effective March 28, 2019, however, H.B. 228 amended R.C. 2901.05 to now place the burden of proof on the State in self-defense cases:

> A person is allowed to act in self-defense * * *. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * *the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense* * * *.

(Emphasis added.) R.C. 2901.05(B)(1). Thus, once there is evidence presented at trial that tends to support that the defendant acted in self-defense, the State must disprove one of the elements of self-defense beyond a reasonable doubt. *Williams* at ¶ 10. Although the incident in this case occurred prior to March 28, 2019, Mr. Warren's trial occurred after March 28, 2019. The trial court applied R.C. 2901.05(B)(1) retroactively and instructed the jury that the State bore the burden of proving beyond a reasonable doubt that Mr. Warren did not act in self-defense. The State acknowledges in its merit brief that it has chosen not to cross-appeal that decision. We take no position on the retroactivity of the modifications and will therefore analyze this matter, as both parties did in their respective briefs, under the current law. *See, e.g., State v. Shealy*, 9th Dist.

Summit No. 29393, 2020-Ohio-1019, ¶ 53, fn. 1 (applying the former version of the statute when the appellant made no argument that the current version was instead applicable).

{¶13} To disprove the first element of self-defense, the State had to show that Mr. Warren was at fault in creating the situation giving rise to the affray. *See Barnes* at 24. Mr. Warren argues that he did nothing to create the situation, but the State presented evidence showing that Mr. Warren was the initial aggressor in the shooting, which included video surveillance footage from multiple angles. *See Williams* at ¶ 9 (stating the first aggressor in an incident is considered to be "at fault" for purposes of self-defense.). The surveillance footage shows Mr. Warren as he exits the restaurant and walks toward his parked vehicle. Upon noticing the victims' vehicle parked nearby, Mr. Warren stops at the rear of his own vehicle, moves his food from his right hand to his left hand, and readies his pocketed gun with his right hand. In a matter of seconds, the two victims exit their vehicle and walk to its rear as Mr. Warren draws his gun and begins shooting at them. T.B. also testified at trial that he never even saw Mr. Warren, and "[e]verything went to black" once he exited his vehicle.

{¶14} Thus, despite Mr. Warren's claim that he did nothing to create the situation, the evidence presented at trial, when viewed in a light most favorable to the prosecution, demonstrated otherwise. We therefore conclude that the State presented sufficient evidence, if believed, to disprove the "at fault" element of self-defense, and the jury could have reasonably concluded beyond a reasonable doubt that Mr. Warren was the initial aggressor in the shooting incident. This determination alone is enough to overrule Mr. Warren's sufficiency argument, as all three elements must be present to establish self-defense. *See Williams* at ¶ 10. In the interest of justice, however, we will continue our analysis and determine if the State presented sufficient evidence to disprove the remaining two elements of self-defense as well.

{¶15}  To disprove the second element of self-defense, the State had to show that Mr. Warren did not have a bona fide belief that he was in imminent danger of death or great bodily harm and that the use of such force was not his only means of escape from such danger.  *See Barnes* at 24.  There is both an objective and a subjective aspect involved in determining whether a defendant had a bona fide belief that he was in imminent danger of death or great bodily harm: an individual's belief that he was in imminent danger must be objectively reasonable, and the individual must have an honest subjective belief to that effect.  *Williams* at ¶ 11.  Both aspects of the "bona fide belief" element require this Court to consider all of the surrounding circumstances.  *Id.*  Additionally, "[t]he privilege to defend oneself is limited to 'that force which is reasonably necessary to repel the attack.'"  *State v. Huguley*, 9th Dist. Summit No. 28322, 2017-Ohio-8300, ¶ 35, quoting *State v. Williford*, 49 Ohio St.3d 247, 249 (1990).

{¶16}  Although a defendant cannot introduce evidence of prior acts on the part of a victim to establish that the victim was the initial aggressor, "'[t]he defendant's state of mind is crucial'" in determining whether he had an honest subjective belief that he faced an imminent threat of harm.  *Williams* at ¶ 12, quoting *State v. Koss*, 49 Ohio St.3d 213, 215 (1990).  "When a defendant offers evidence of prior threats of violence, the gravamen of the evidence is the reason that the threats were made."  *Id.*  "Unless an explanation for the reason for prior threats is offered, it is unlikely that they will establish reasonable grounds for believing that an imminent threat of harm existed."  *Id.*

{¶17}  Mr. Warren testified that, in January of 2014, someone shot up his car and shattered the windows, yet he admitted never reporting the incident to police.  Mr. Warren further testified that, on the following day, he and S.S. were stopped in his vehicle at a yield sign on the road while he was "rolling up some weed."  He testified that D.T.—whom he knew by the nickname

"Duke"—pulled up beside them and shot him in the arm. Mr. Warren recalled telling an officer at the hospital that Duke shot him, but claimed the officer never wrote down the name or otherwise included it in his report. On cross-examination, Mr. Warren offered contradictory testimony and agreed with the prosecutor's suggestion that he never told police who shot him because he was scared of D.T. S.S. also testified that D.T. was the shooter in 2014, but claimed that she lied to police that day and said she had not seen the shooter. Neither Mr. Warren nor S.S. offered any testimony as to possible reasons behind the 2014 shooting. Lieutenant David Whiddon of the Akron Police Department ("APD") also testified that there were no leads to follow in the 2014 shooting because neither Mr. Warren nor S.S. could identify the shooter.

{¶18} According to Mr. Warren, D.T. also threatened him 4 or 5 times over social media. No copies of any social media posts made by D.T. were introduced at trial. Specifically, Mr. Warren claimed D.T. made a statement that he was going to show up at Mr. Warren's doorstep and turn his white t-shirt red, which Mr. Warren understood as a threat to shoot him again. Mr. Warren testified that he changed his lifestyle in various ways and has lived in fear since 2014. The State, however, introduced some of Mr. Warren's own social media videos to call into question his claim of living in fear. In an Instagram video recorded on the morning of the 2018 shooting, Mr. Warren filmed himself driving around in a convertible with the top down while laughing and singing along to a song. In a YouTube video from June 23, 2018—i.e., 8 days before the shooting—Mr. Warren talks to the camera about facing or confronting fears and handling the situation, and how he has learned that he needs to "get it over with" and "do something about this * * *." The video culminates with Mr. Warren using his hands to seemingly mimic firing two handguns while saying, "F**k it, like, if anything happen (sic), I see you, I see you, boom-boom-boom-boom-boom. It's goin' down, all that." Mr. Warren testified that this statement meant "if

you see me, I know you (sic) probably going to try to kill me or something[,] so of course we (sic) going to have - - we (sic) going to transfer fire."

{¶19} Regarding the day of the 2018 shooting, T.B. and M.S. both testified that the three victims were simply going to the restaurant to eat breakfast that day. The surveillance footage shows Mr. Warren entering the restaurant with his son, approaching S.R., and engaging him in a verbal argument. A waitress testified that the two men both seemed pretty agitated during the argument. The surveillance footage shows both men gesticulating with their hands during the argument. Mr. Warren testified that the argument was over S.R.'s treatment of the mother of one of Mr. Warren's children. He recalled S.R. suggesting that they "take it outside[,]" so he anticipated a fistfight and wanted to get his son out of there. He testified that he called S.S. to come pick up their child because he did not want his son around while he was arguing or if he was "about to get in a fight." He also contacted someone else[1] using FaceTime and aimed his phone at S.R., which he testified was to indicate "if anything happen[s] to me, this is the person that did it." After his son was picked up, Mr. Warren can be seen in the surveillance footage re-entering the restaurant and speaking to a waitress before sitting down on a chair near the front door and occasionally using his cellphone. A nearby patron testified that he overheard an "agitated" Mr. Warren saying something on the phone about wanting to "fight someone" or "fight him."

{¶20} The surveillance footage shows B.E. soon arriving, entering the restaurant for a moment, making brief visual contact with Mr. Warren, and then walking back outside. After Mr. Warren gets his food, he walks to his car, while B.E. emerges from offscreen and follows behind him, positioning his right hand near his waistband or right pants pocket. The victims' vehicle had

---

[1] Mr. Warren testified that he could not remember who he called besides S.S., but specifically testified that it was not his co-defendant, B.E. He admitted to knowing B.E., however, because the two men would rap and create podcasts together.

just arrived and parked in the side lot. Mr. Warren testified that the tinted windows on the victims' car put him on edge. Because of his recent argument inside, he testified that he put his hand on his gun "[j]ust in case something was about to go down." Mr. Warren admitted to recognizing D.T. as he exited the vehicle. He testified that one of the men said, "What's up, b\*\*\*h ass n\*\*\*\*r" to him, but the surveillance videos do not contain any audio. He testified that D.T.'s right hand moved toward a gun hanging out of his right pants pocket, which concerned him because D.T. shot him back in 2014. He admitted, however, that "[D.T.'s hand] could have been doing anything * * *." Still, Mr. Warren testified that he believed his life was in danger and he had to defend himself by getting to his gun first. When Mr. Warren was asked on cross-examination what he was thinking at that time, he testified: "[D.T.]'s going to shoot me again. I got (sic) to get to mine first." He also conceded that he shot the two men without giving them any verbal warning.

{¶21} In the surveillance footage, D.T. does not appear to make any threatening actions or gestures toward Mr. Warren. Although it was later determined that D.T. did, in fact, have a concealed gun on his person, he does not display or brandish it, nor does he appear to reach for his waistband or pants pocket at any time prior to Mr. Warren opening fire. Detective Kevin Davis of the APD analyzed the surveillance footage and testified that the victims do not make any motions toward their waistbands or engage in any "aggressive footwork or posturing" before being shot, and their arms are visibly down below their waistlines with nothing in their hands. He testified that D.T. never drew his gun, but it fell to the ground while he was later being pursued by B.E. around the car. Detective Donald Frost of the APD subsequently recovered D.T.'s gun—which T.B. had picked up and thrown away from the scene after the shooting—and testified that, while the gun was indeed loaded, the weapon's safety mechanism was still on or engaged.

{¶22}  To disprove the third element of self-defense, the State had to show that Mr. Warren violated a duty to retreat or avoid the danger.  *See Barnes* at 24.  "When deadly force is used in self-defense there exists a duty to retreat before exercising that deadly force."  *State v. Davis*, 10th Dist. Franklin No. 19AP-521, 2020-Ohio-4202, ¶ 31.  "Deadly force" is "any force that carries a substantial risk that it will proximately result in the death of any person[,]" which includes the use of a gun.  R.C. 2901.01(A)(2); *State v. Guice*, 10th Dist. Franklin No. 18AP-305, 2019-Ohio-1324, ¶ 32, fn. 4.

{¶23}  The shooting in this matter occurred outside in the restaurant's side parking lot. The surveillance footage shows Mr. Warren stopping and standing by the rear of his car, which is positioned between him and the victims' car.  Nothing is blocking Mr. Warren from either entering his car and leaving or simply fleeing the scene on foot in any direction.  When the prosecutor pointed out during cross-examination that nothing was stopping Mr. Warren from leaving the scene, Mr. Warren replied, "I guess not."  Mr. Warren agreed that nothing was stopping him from leaving, but testified nonetheless that he did not leave because he "probably would have got (sic) shot."

{¶24}  When reviewing the evidence in a light most favorable to the prosecution, this Court concludes that the State presented sufficient evidence, if believed, to disprove not only one, but all three elements of self-defense in this matter.  D.T. never reached for or drew his gun.  Mr. Warren undeniably escalated the situation as the initial aggressor by shooting the victims without warning.  The State's evidence called into question whether D.T. actually shot Mr. Warren in 2014 or threatened him thereafter.  Instead, the evidence demonstrated that Mr. Warren was agitated, looking for a fight, called for armed backup, and was intent on getting to his gun first.  Even assuming D.T. called Mr. Warren a derogatory name, shooting him in response clearly exceeds

the amount of force reasonably necessary to repel the verbal insult. Mr. Warren could have easily fled the scene, but he chose to stay and shoot the victims instead. Consequently, a rational jury could have found beyond a reasonable doubt that Mr. Warren (1) was at fault in creating the situation giving rise to the affray; (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) violated his duty to retreat or avoid the danger. *See Barnes* at 24.

{¶25} After a review of the entire record, we further determine that Mr. Warren's convictions were not against the manifest weight of the evidence. When presented with ample evidence to the contrary, the jury chose not to believe Mr. Warren's claims that D.T. shot him in 2014, threatened him on social media, and was reaching for a gun in 2018, causing Mr. Warren to fear for his life. It is well-established that a trier of fact enjoys the best position to assess the credibility of witnesses. *State v. Tyus*, 9th Dist. Summit No. 29520, 2020-Ohio-4455, ¶ 57. *See also Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35 ("[T]he jury is free to believe all, part, or none of the testimony of each witness."). The jury was free to conclude, based on all of the evidence, that the State disproved beyond a reasonable doubt Mr. Warren's tenuous claim of self-defense. As this Court has oft stated, we "'will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version.'" *State v. Tolliver*, 9th Dist. Lorain No. 16CA010986, 2017-Ohio-4214, ¶ 15, quoting *State v. Barger*, 9th Dist. Medina No. 14CA0074-M, 2016-Ohio-443, ¶ 29. Upon our review of the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we determine that the jury, in resolving any conflicts in the evidence, did not clearly lose its way and create a manifest miscarriage of justice requiring a reversal of Mr. Warren's convictions and a new trial. *See Otten*,

33 Ohio App.3d at 340. This is also not the exceptional case in which the evidence weighs heavily against the conviction. *See Thompkins*, 78 Ohio St.3d at 387.

{¶26} Mr. Warren's first assignment of error is overruled.

### ASSIGNMENT OF ERROR TWO

THE TRIAL COURT ERRED IN ACCEPTING INCONSISTENT VERDICTS WITH RESPECT TO COUNTS 4 AND 5 IN THE INDICTMENT.

{¶27} In his second assignment of error, Mr. Warren argues that the trial court committed plain error in accepting inconsistent verdicts. We disagree.

{¶28} Mr. Warren never objected or raised any argument regarding inconsistent verdicts at the trial court level and has thus forfeited all but plain error on appeal. *State v. Hamilton*, 9th Dist. Lorain No. 17CA011238, 2019-Ohio-1829, ¶ 23, citing *State v. Singh*, 9th Dist. Summit No. 28819, 2018-Ohio-3473, ¶ 15. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "To establish plain error, one must show (1) an error occurred, i.e., a deviation from a legal rule, (2) the error is plain, i.e., an obvious defect in the proceedings, and (3) the error affected a substantial right, i.e., affected the outcome of the proceedings." *State v. Grant*, 9th Dist. Summit No. 29259, 2019-Ohio-3561, ¶ 5, citing *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 36. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶29} Mr. Warren argues that the jury reached inconsistent verdicts in finding him guilty of felonious assault against T.B. and not guilty of felonious assault against M.S., and the trial court then committed plain error in accepting those verdicts. He surmises that the jury determined that he did not have the requisite mens rea to commit felonious assault against M.S., so it should have

also determined that he did not have the requisite mens rea to commit felonious assault against T.B. He cites to no authority, however, in support of this argument. *See* App.R. 16(A)(7). We further find no merit in his argument because, even assuming arguendo that the verdicts were inconsistent, reversal would not be warranted, as "'[i]nconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict.'" *State v. Wasil*, 9th Dist. Wayne No. 18AP0001, 2018-Ohio-4463, ¶ 7, quoting *State v. Hicks*, 43 Ohio St.3d 72, 78 (1989), citing *United State v. Powell*, 469 U.S. 57, 68 (1984). "'The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.'" *Id.*, quoting *State v. Adams*, 53 Ohio St.2d 223 (1978), paragraph two of the syllabus, *vacated on other grounds, sub nom. Adams v. Ohio*, 439 U.S. 811 (1978). *See also Singh* at ¶ 15 ("[J]uries are not required to reach consistent verdicts between separate counts."). Mr. Warren has therefore failed to establish any error, let alone plain error, committed by the trial court under this assignment of error.

{¶30} Mr. Warren's second assignment of error is overruled.

III.

{¶31} Mr. Warren's first and second assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

SCHAFER, J.
CONCURS.

CALLAHAN, P. J.
CONCURRING.

{¶32} I concur in the majority's resolution of Mr. Warren's assignments of error, but I write separately because I question whether a sufficiency analysis of self-defense is appropriate under the amended statute. *See Smith v. U.S.*, 568 U.S. 106, 110 (2013), quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977) (noting that "'[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required.'"). *See also In re Winship*, 397 U.S. 358, 364 (1970). Nonetheless, the parties have not raised this question, and I concur in the majority's disposition of the first assignment of error on that basis.

APPEARANCES:

JACOB T. WILL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.