[Cite as *State v. Scott*, **2024-Ohio-2355.**]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| --- | --- | --- |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | | C.A. No. 30662 |
| --- | --- | --- |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| D'LAWRENCE SCOTT | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR-2022-06-2291-A |

DECISION AND JOURNAL ENTRY

Dated: June 20, 2024

STEVENSON, Presiding Judge.

**{¶1}** Defendant-Appellant, D'Lawrence Scott, appeals from the judgment of the Summit County Court of Common Pleas. For the reasons that follow, this Court affirms.

I.

**{¶2}** This matter arises from the murder of J.D., the 15-year-old brother of Mr. Scott's girlfriend, D.D. Mr. Scott was indicted on the following charges: count one, murder, an unclassified felony, in violation of R.C. 2903.02(A)(D)/R.C. 2929.02(B), with a firearm specification; count two, murder, an unclassified felony in violation of R.C. 2903.02(A)(D)/R.C. 2929.02(B), with a firearm specification; count three, improperly discharging a firearm at or into a habitation or school safety zone, a felony of the second degree in violation of R.C. 2923.161(A)(1)(C), with a firearm specification; count four, felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(D)(1)(a), with a three-year firearm specification; and count five, assault, a

misdemeanor of the first degree, in violation of R.C. 2903.13. Mr. Scott pleaded not guilty to the charges.

{¶3} A jury found Mr. Scott guilty on counts one, two, three, and four, including the firearm specifications, and not guilty on count five. For sentencing purposes, the court merged counts two and four, including the firearm specifications, into count one with firearm specification. Mr. Scott was sentenced to a total prison term of life with parole eligibility after 21 full years.

{¶4} Mr. Scott timely appealed and asserts four assignment of error for our review. Pursuant to this Court's order, the parties filed supplemental briefs regarding Mr. Scott's first and second assignments of error. For the reasons set forth below, we affirm.

II.

**FIRST ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT-APPELLANT'S MOTION IN LIMINE TO EXCLUDE IRRELEVANT TESTIMONY.**

{¶5} Mr. Scott alleges in this assignment of error that the trial court abused its discretion and committed reversible error by failing to grant his motion in limine and allowing testimony regarding two unrelated firearms found in a Cleveland, Ohio residence during the execution of a search warrant shortly after his arrest. Mr. Scott argues that this testimony did not pertain to any element of the crimes charged and whether Mr. Scott acted in self-defense, but instead, was improper character evidence that painted him out as someone who was violent, dangerous, and was constantly around guns. We disagree.

{¶6} "'Trial court decisions regarding the admissibility of other-acts evidence under Evid.R. 404(B) are evidentiary determinations that rest within the sound discretion of the trial court.'" *State v. Adams*, 9th Dist. Lorain No.15CA010868, 2017-Ohio-1178, ¶ 7, quoting *State v.*

*Morris*, 132 Ohio St.3d 337, 338, 2012-Ohio-2407, syllabus. "As such, an appellate court will review such a decision under an abuse of discretion standard." *Id*. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶7} Several weeks prior to trial, Mr. Scott moved to exclude any evidence relating to other crimes, wrongs, or acts under R.C. 2945.59 (Proof of defendant's motive), Evid.R. 404(B) (admissibility of other crimes, wrongs, or acts), and Evid.R. 401, 402, and 403 (relevance). The trial court took the matter under advisement. Before the start of trial, Mr. Scott filed a more specific motion in limine requesting an order requiring the State to refrain from mentioning the firearms found in the Cleveland residence where Mr. Scott stayed briefly after J.D.'s murder. The trial court did not issue a written order on the motion before the trial. At trial, Mr. Scott did not object when testimony about the discovery of the weapons was adduced from the investigating officers. Later, at the close of the State's case and during a discussion about the admission of the State's exhibits, the trial court stated for the record that there was an earlier discussion off the record related to the motion in limine" in which the court "did indicate that [this] testimony would be allowed."

{¶8} Pursuant to the 2017 amendments to Evid.R. 103(A), the denial of a motion in limine can preserve error if the court ruled definitely on the issue, which means the party that made the motion would not need to renew an objection in order to preserve appellate review. Here, the trial court did not formally rule on the motion in limine before trial, but did indicate during trial that it had denied the motion during a previous off the record discussion. Therefore, the colloquy that took place on the record established that the trial court denied the motion in limine, thus preserving the issue of the admissibility of the evidence for appellate purposes. Because the issue was preserved, we will address the merits of Mr. Scott's argument.

{¶9} The officers' testimony was that BCI testing showed that Mr. Scott's DNA was not found on the firearms and that the firearms were not used in the murder of J.D. The firearms did not match the shell casings found at the scene. Also, a person at the residence where the weapons were found claimed ownership of the guns. Thus, the testimony showed that the weapons had no connection to the alleged crimes in Mr. Scott's case. Therefore, this evidence did not implicate Mr. Scott in any way or connect him with gun activity or ownership. Instead the firearms evidence was part of the Akron Police detectives' explanation of their actions during the investigation as it unfolded over the course of several days after J.D.'s murder and served only as background information, not other acts evidence. *See State v. Parsons*, 9th Dist. Lorain No. 18CA011328, 2019-Ohio-5021, ¶ 7 (this Court affirmed admission of identification evidence properly admitted for a nonhearsay purpose because it "did not connect [the defendant] with the crime" and was offered for the "purpose of explaining the progress of the police investigation[,]" thus the risk of unfair prejudice was low).

{¶10} Based on the foregoing, we conclude that the trial court did not abuse its discretion by admitting the officers' testimony regarding the firearms found in the Cleveland residence. Accordingly, Mr. Scott's first assignment of error is overruled.

## SECOND ASSIGNMENT OF ERROR

**DEFENDANT-APPELLANT'S 6TH AMENDMENT RIGHTS WERE VIOLATED WHEN HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.**

{¶11} Here, Mr. Scott argues that he was denied effective assistance of counsel when his trial counsel failed to timely object to the introduction of the firearm evidence that was the subject of his motion in limine. Mr. Scott alleges that this ineffectiveness by his trial counsel permitted the jury to hear testimony that should have been excluded due to its prejudicial nature and prevented

this Court from reviewing the argument regarding the admission of the firearms evidence on appeal because it was not properly preserved. We disagree.

{¶12} To warrant reversal based on ineffective assistance of counsel, the defendant must show that his counsel was "deficient and that he was prejudiced by that deficiency." *State v. Morgan*, 9th Dist. Medina No. 07CA0124-M, 2008-Ohio-5530, ¶ 37. When assessing trial counsel's performance, this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Strickland v. Washington,* 466 U.S. 668*,* 689 (1984). "'[T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 694. Mr. Scott is unable to satisfy either prong of this test.

{¶13} The basis for Mr. Scott's claim of ineffective assistance is that his counsel did not object at trial to the firearms evidence. However, as outlined in our discussion under the first assignment of error, the trial court issued a definitive ruling on the merits of his motion in limine. Therefore, a contemporaneous objection was not required to preserve the issue for appeal. Since no objection was required, Mr. Scott's trial counsel was not deficient for not objecting. Accordingly, Mr. Scott's second assignment of error is overruled.

### THIRD ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED BY FAILING TO GRANT DEFENDANT'S CRIM. R. 29 MOTIONS FOR ACQUITTAL AND ENTERING JUDGMENT ON THE VERDICT UNSUPPORTED BY SUFFICIENT EVIDENCE.**

{¶14} At trial, Mr. Scott moved for acquittal after the State rested and renewed the motion at the end of trial. The trial court denied the motion both times. His argument to the trial court in

support of his motions was that the State failed to prove all the elements of the counts in the indictment.

{¶15}    In his merit brief, Mr. Scott argues that the trial court erred in overruling his motions for acquittal because he "was in the process of attempting to flee the situation and fired six shots towards J.D. *in defense of himself and his children* from the very real and perceived threat of J.D. advancing on him with a gun." (Emphasis added.) This argument sounds in self-defense. Mr. Scott's appellate counsel confirmed during oral argument that his argument under this assignment of error is, in fact, that the trial court erred in overruling his motions for acquittal because he did not act with the purpose to kill, but instead, with the purpose of defending himself against J.D.

{¶16}    Self-defense is an affirmative defense in Ohio. *State v. Fleckenstein*, 9th Dist. Lorain No. 22CA011886, 2023-Ohio-4347, ¶ 23, citing *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 24. "'[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that [his] use of force was in self-defense.'" *Id.*, quoting *Messenger* at ¶ 25.  Once a defendant satisfies his burden of production, the burden of persuasion shifts to the State "'to prove beyond a reasonable doubt that the accused did not use force in self-defense.'" *State v. Moore*, 9th Dist. Summit No. 29581, 2023-Ohio-2864, ¶ 9, quoting *State v. Brooks*, 170 Ohio St.3d 1, 2022-Ohio-2478, ¶ 6.  In *Messenger*, the Ohio Supreme Court addressed the question of whether "'[s]elf-defense claims may be reviewed on direct appeal for sufficiency of the evidence.'" *Messenger* at ¶ 12. The *Messenger* Court ultimately held that "[t]he state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal, and the Tenth District [Court of Appeals] correctly declined to review the state's rebuttal of self-defense for sufficiency of the evidence." *Id.* at ¶ 27.

{¶17} We have applied the holding in *Messenger* in several recent cases, analyzing the State's rebuttal of self-defense under a manifest weight review rather than a sufficiency analysis. *See, e.g., Fleckenstein; State v. McElroy*, 9th Dist. Lorain No. 22CA011846, 2023-Ohio-1609; *State v. Greenstreet*, 9th Dist. Summit No. 30387, 2023-Ohio-4224; *State v. Alexander*, 9th Dist. Summit No. 30053, 2023-Ohio-3450.

{¶18} Accordingly, based on the authority of *Messenger,* we must apply a manifest weight of the evidence standard of review to the State's burden of disproving self-defense rather than a sufficiency of the evidence review. Therefore, as Mr. Scott's sufficiency argument lies in self-defense, which is subject to a manifest weight review on appeal, the trial court did not err in denying his Crim.R. 29(A) motions for acquittal. Mr. Scott's third assignment of error is without merit and overruled.

## FOURTH ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED BY ENTERING JUDGMENT ON THE VERDICT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶19} When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 9th Dist. Summit No. 29290, 2019-Ohio-3970, ¶ 26. This Court "'will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version.'" *State*

*v. Warren*, 9th Dist. Summit No. 29455, 2020-Ohio-6990, ¶ 25, quoting *State v. Tolliver*, 9th Dist. Lorain No. 16CA010986, 2017-Ohio-4214, ¶ 15.

{¶20} At trial, the State presented testimony from the following individuals: Mr. Scott's girlfriend D.D., Akron Police Officers Thomas Phillips and Warren Spragg who responded to the scene, Officer Adam Clark from the crime scene unit who collected evidence at the scene, Detective Troy Meech from the fugitive task force who assisted in the arrest of Mr. Scott, Mr. Kevin Kramer, a member of the firearm section of the Ohio Bureau of Criminal Investigation ("BCI"), Detective Kelly Brown from the juvenile crimes unit, four neighbors who witnessed various events surrounding the murder, and Dr. Kristy Waite from the Summit County Medical Examiner's Office. The State also introduced into evidence the 911 phone call made by D.D.'s grandmother, L.E. ("Grandmother"), who was present at the scene, as well as body worn camera footage from the responding officers. The defense presented the testimony of Mr. Scott and his father, L.S. ("Father"). There are discrepancies between the testimony presented by the State and the testimony presented by Mr. Scott regarding the events surrounding the shooting.

{¶21} D.D. testified that on the day in question, Mr. Scott was visiting with her at her residence in Akron. Also present were Mr. Scott's two young children, the victim J.D., D.D.'s younger brother, D.D.'s nephew, and Grandmother. According to D.D., J.D. and Mr. Scott were in the basement playing a video game when Mr. Scott and D.D. got into an argument about text messages on Mr. Scott's phone from the mother of his children. After D.D. refused to return Mr. Scott's phone, the altercation became physical. Mr. Scott threw D.D. into a door of the house, pushed her, and put his hand around her neck. J.D. broke up the fight, then Mr. Scott called Father and asked for a ride from D.D.'s house.

{¶22} According to D.D., just minutes later, another altercation ensued between her and Mr. Scott. D.D. threw water on Mr. Scott as he was walking up the stairs to leave. Mr. Scott kicked D.D. down the stairs and punched her in the face, loosening her teeth. J.D. and a neighbor from the adjoining residence, J.C., assisted in breaking up the fight. Grandmother then called 911 and asked the operator to send the police, stating "they got guns." D.D. did not see J.D. with a gun, but said Mr. Scott was carrying a gun in one hand and one of his children in the other hand. J.D. followed Mr. Scott upstairs to the kitchen area where he told Mr. Scott he wanted to "kick his ass[.]"

{¶23} D.D. further testified that when Father arrived, Mr. Scott went outside, put his children in the back seat of Father's vehicle, then walked "fast" back towards the porch where J.D. was standing. D.D. stated that she then heard Mr. Scott rack the slide of his gun as he was walking toward the house. At that point, D.D. was standing on the porch waiting for Mr. Scott to leave and Grandmother was holding J.D. D.D. told both Grandmother and J.D. to go into the house because Mr. Scott had a gun. During D.D.'s testimony, the State played the 911 call. D.D. identified J.D.'s voice as saying "[q]uit touching my gun," and identified Grandmother's voice urging J.D. to give her the gun. D.D. testified that Mr. Scott fired the shots that were heard as he walked towards J.D.

{¶24} Mr. Scott's version of the events was different from D.D.'s. As relevant to the issues before us, Mr. Scott testified to the following. After the neighbor, J.C., appeared on the scene to separate Mr. Scott and D.D. and as Mr. Scott was gathering his belongings, J.D. ran down the stairs with his gun drawn and began threatening Mr. Scott, yelling "I'm going to shoot you. I'm going to kill you. Come outside. I'm going to beat your ass, pistol whip you[.]" At that point, both Mr. Scott and J.D. had their guns drawn. J.D. then ran back up the stairs. Mr. Scott put his gun on his hip, grabbed his children, and went to the living room to look out the window for Father. J.D. was still yelling and threatening him with a small black handgun. When Father pulled into the

driveway, Mr. Scott walked out the door and onto the porch with one child in one hand and the other child walking beside him. J.D. got in his face on the porch, pushing Mr. Scott's head with one hand and putting his gun to Mr. Scott's forehead with the other hand, telling Mr. Scott, "I'm going to kill you."

{¶25} According to Mr. Scott, Father then came up on the porch, grabbed Mr. Scott's children, and took them back to the car, all the while J.D. still had the gun pressed to Mr. Scott's head with Grandmother trying to take the gun away. Mr. Scott tried to back down the stairs toward the car while J.D. continued to tap his gun on Mr. Scott's head. Mr. Scott was afraid to turn his back on J.D. because he thought J.D. was either going to shoot him in the back and kill him or shoot at the car with his children inside. As J.D. started to move around Grandmother, Mr. Scott pulled his gun off his hip and fired six times at J.D. while backing up toward the street. Mr. Scott ran from the scene and Father picked him up a few houses down.

{¶26} Mr. Scott's Father testified as follows. When he arrived on the scene and got out of his car, he saw people standing on the porch. Mr. Scott was against the wall and J.D. was standing over him. J.D. had a gun to Mr. Scott's head and was hitting him in the head with it repeatedly. Father then asked what was going on, walked up to the porch, and asked if he could retrieve his grandchildren. J.D. replied in a threatening manner. J.D. then grabbed Mr. Scott in the face and pushed him back with the gun still in his hand. Father took his grandchildren back to the car, leaned into the vehicle to buckle them in, then heard gunshots, after which he exclaimed "No, no, no, D'Lawrence." Father stated that he could not see the shots being fired, but moments later saw Mr. Scott running up the street. Father got into his vehicle, picked up Mr. Scott, and left the scene.

{¶27}   The recording of the 911 call reflects that the voice identified as Grandmother's is heard asking J.D. several times to give her the gun.  A few seconds later, the voice identified as J.D.'s is heard saying "get your kids n[***]'s, come on n[***]'s get y'all's kids, would you?" followed by "quit touching my gun," which is consistent with the testimony of Grandmother's attempts to take the gun.  Directly afterwards, there is an approximate 20-second period in the recording where the only voice heard is the 911 operator stating that two cruisers were en route.  Then, the voice identified as Father's is heard saying "Don't do it, D'Lawrence, come on man, D'Lawrence, D'Lawrence, no," followed by the gunshots and someone screaming "ah!"

{¶28}   The body worn camera footage captured the statements of S.C., the neighbor in the adjoining residence next door.  Although the trial court deemed S.C. unavailable to testify for medical reasons, it allowed her statements into evidence as an excited utterance. S.C. is shown on the video reenacting what she witnessed and stating that she saw Grandmother standing next to J.D. when the shooter "walked up on the porch, then pow, pow, pow."

{¶29}   B.R., a neighbor two houses down, testified that he saw Mr. Scott "running backwards in the street, facing towards the duplexes.  And that's when [Mr. Scott] said something along the lines of, yeah, little n[****], I don't play.  Look at you now."  B.R. saw Mr. Scott waving a gun in the air as he ran backwards.

{¶30}   A woman visiting a neighbor across the street testified that she saw a man "come from the house with something in their hand, * * * [i]t was covered * * * [i]t could be a car seat[,] [i]t could be a crib.  I just saw it was something being carried. * * * I just thought it was a baby seat or something."  She further testified that she saw the man "start with [the baby seat] walking over, and the door opened to the car[.]" After the shooting, both she and the neighbor saw a man with

"dreadlocks" and "kind of like an Afro maybe[,]" who was "kind of stocky-ish" running with a gun in his hand to a tree several houses down where he got into Father's vehicle and left in a hurry.

**{¶31}** It is undisputed that one of the shots Mr. Scott fired struck J.D. in the torso and that J.D. later died as a result of that gunshot wound. Mr. Scott was arrested by the Fugitive Task Force without incident two days later in Cleveland, Ohio following a traffic stop.

**{¶32}** As previously noted, at trial, Mr. Scott's defense was that he acted in self-defense, not premeditatively with purpose to kill. The State concedes that Mr. Scott presented some evidence tending to support the use of force in self-defense, thus triggering its "duty to disprove self-defense." *Messenger,* 171 Ohio St.3d 227, 2022-Ohio-4562, at ¶ 20.

**{¶33}** The elements of self-defense are as follows:

> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*Id*. at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "'All three of these elements must be present to establish self-defense.'" *State v. Zink*, 9th Dist. Lorain No. 21CA011813, 2023-Ohio-1250, ¶ 9, quoting *Warren*, 9th Dist. Summit No. 29455, 2020-Ohio-6990, at ¶ 12. To carry its burden of persuasion, the State need only disprove one of the foregoing elements beyond a reasonable doubt. *State v. Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 10.

**{¶34}** Mr. Scott maintains that this is an exceptional case in which the evidence weighs heavily against the conviction and that the jury lost its way in concluding that he was not acting in self-defense. He argues that his conduct satisfies the elements of a self-defense claim because: 1) J.D. was the one at fault in creating the situation giving rise to the shooting because J.D. started the fight by threatening to shoot and kill Mr. Scott; 2) he had a bona fide belief that he was in imminent

danger of death or great bodily harm because J.D. put a gun to his head and told him he was going to kill him; and 3) he was retreating from the residence when he shot J.D.  We disagree with Mr. Scott.

{¶35}    As outlined below, the State presented several witnesses from whose testimony the jury could have concluded that Mr. Scott was not acting in self-defense. Collectively, that evidence showed that at the time Mr. Scott shot J.D., he was not trying to extricate himself from J.D. and retreat from the porch after J.D. held a gun to his head, but rather, Mr. Scott had already been off the porch and at Father's car, then returned to the porch when he shot J.D., thus reinitiating the altercation.

{¶36}    D.D. testified that when she was standing in front of J.D. and Grandmother on the porch, Mr. Scott took his children to Father's vehicle, cocked his gun, walked quickly back up to the porch, and fired the shots.  S.C. stated that Mr. Scott "walked up on the porch" then fired the shots while Grandmother was standing next to J.D.  In order for Mr. Scott to have walked back up to the porch or "up on the porch," he had to have been off the porch prior to that time.  The woman across the street said a man was "com[ing] from the house" with what resembled a baby seat and headed towards Father's car.  The woman's description most closely matches D.D.'s and S.C.'s testimony regarding Mr. Scott, who was leaving the house to go towards Father's car, and not Father, who was going to the house from the direction of his car.  Therefore, the jury was free to believe the State's evidence that Mr. Scott left the porch to put his children in Father's vehicle before returning to shoot J.D. and was never standing on the porch with J.D. holding a gun to his head.

{¶37}    The jury was also free to conclude that at that point, Mr. Scott had no bona fide belief that he was in danger.  The 911 call reflects J.D.'s statement, "get your kids n[***]'s, come

on n[***]'s get y'all's kids, would you?" from which the jury could have reasonably concluded that J.D. was urging Mr. Scott to leave, and therefore, wanted to de-escalate the situation and no longer posed a threat. However, instead of leaving the scene, Mr. Scott reinitiated an altercation by returning to the porch and shooting J.D. The 911 call includes an approximate 20-second space of time where there was no sound other than the 911 operator's voice, then Father's exclamations imploring Mr. Scott not to shoot, followed by the gunshots. That order of events matches the other evidence that Mr. Scott left the porch, went to the car, then returned to the porch to shoot J.D. The fact that Father was pleading with Mr. Scott not to shoot raises the reasonable inference that Mr. Scott had yet another opportunity to pause, give second thought to his actions, and heed Father's urging to refrain from shooting.

{¶38} Moreover, Mr. Scott's actions after the shooting further undermine his self-defense claim. Mr. Scott was overheard by the neighbor, B.R., gloating about his actions and stating "yeah little n[****], I don't play. Look at you now" then waving a gun in the air as he ran backwards. The jury was free to conclude that this behavior was not characteristic of someone who was in fear of another, but rather, of someone who was proud of their actions.

{¶39} Furthermore, the jury was free to reject Mr. Scott's evidence as not credible due to inconsistencies regarding certain facts. For example, Father testified that he was leaning into the vehicle to put the children in the backseat when he heard the shots, then exclaimed "No, no, no D'Lawrence" out of fear that Mr. Scott might have been the one who was shot. However, the 911 call clearly reflects that Father said that prior to the sound of the gunshots, not after. Also, Father testified that when he arrived, Mr. Scott was standing on the porch with J.D. pointing a gun to his head. Yet, Mr. Scott testified that he was still inside the house when Father arrived. In addition, Father testified that when he got out of his car, he asked what was going on and if he could retrieve

his grandchildren. He is not heard making any such statements on the 911 call. Considering these inconsistencies, the jury could have concluded Mr. Scott's evidence was not credible.

**{¶40}** Based on the foregoing, the jury reasonably could have concluded that Mr. Scott was at fault in creating the situation that gave rise to J.D.'s death, and that Mr. Scott lacked a bona fide belief that he was in imminent danger of death or great bodily harm such that his only means of escape was the use of deadly force. *See Messenger,* 171 Ohio St.3d 227, 2022-Ohio-4562, at ¶ 14, quoting *Barnes*, 94 Ohio St.3d at 24. Therefore, while the State was only required to disprove one of the elements of  self-defense beyond a reasonable doubt, it went beyond its burden and presented evidence disproving two of the elements.  *See Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, at ¶ 10.

**{¶41}** The jury, as the trier of fact, was in the best position to evaluate the credibility of the testimony and evidence and was free to believe the State's theory of the events and reject Mr. Scott's version. *State v. Shank*, 9th Dist. Medina No. 12CA0104-M, 2013-Ohio-5368, ¶ 29. Mr. Scott has not shown that this is an exceptional case where the evidence weighs heavily against the conclusion that the State disproved his claim of self-defense. *See Williams* at ¶ 32.

**{¶42}** Accordingly, the jury's determination that Mr. Scott did not act in self-defense is not against the manifest weight of the evidence.  Mr. Scott's fourth assignment of error is overruled.

III.

**{¶43}** Mr. Scott's assignments of error are overruled.  The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

SCOT STEVENSON
FOR THE COURT

 

SUTTON, J.
CONCURS.

CARR, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

SENECA KONTURAS, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.