[Cite as *State v. McCormick*, 2019-Ohio-2204.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 29121 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DARSHAWN MCCORMICK | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2017-01-0309 |

DECISION AND JOURNAL ENTRY

Dated: June 5, 2019

CARR, Judge.

{¶1} Defendant-Appellant, Darshawn McCormick, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} The victim in this matter was gunned down in broad daylight just outside the apartment that he shared with his girlfriend. Three men were seen running from the scene, one of whom was later identified as McCormick. The police were unable to apprehend McCormick that day because, as an officer stopped the vehicle in which McCormick was riding, he jumped from it and fled on foot. Nevertheless, the police were able to apprehend one of the other men who had been with McCormick, and he led them to evidence that helped identify McCormick as the shooter. That evidence included the sweatshirt McCormick had been wearing that day, which tested positive for gunshot residue. Additionally, the police discovered at McCormick's residence a partially loaded magazine containing the same model and caliber bullets used to kill

the victim. After interviewing McCormick and collecting additional statements, the police arrested him.

{¶3} A grand jury indicted McCormick on charges of murder, felony murder, felonious assault, and having a weapon under disability. His indictment also included three firearm specifications linked to his counts for murder, felony murder, and felonious assault. Following a jury trial, the jury found McCormick guilty of each of his counts and specifications. The court then merged his felony murder and felonious assault counts and specifications with his murder count and specification. It ordered him to serve consecutive sentences on his remaining specification and counts for a total of 20.5 years to life in prison.

{¶4} McCormick now appeals from his convictions and raises two assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE EVIDENCE IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE CONVICTIONS[.]

{¶5} In his first assignment of error, McCormick argues that his convictions are based on insufficient evidence because the State failed to prove identity. He asserts that the evidence, if believed, only showed that he was in the vicinity of the victim's murder, not that he perpetrated it. Upon review, we do not agree that his convictions are based on insufficient evidence.

{¶6} Whether the evidence in a case is legally sufficient to sustain a conviction is a question of law that this Court reviews de novo. *See State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. Although the standard of review is de novo, the appellate court does not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact. *State v. Tucker*, 9th Dist. Medina No. 14CA0047-M, 2015-Ohio-3810, ¶ 7.

{¶7} "The identity of a perpetrator must be proved by the State beyond a reasonable doubt." *State v. Moorer*, 9th Dist. Summit No. 27685, 2016-Ohio-7679, ¶ 24. "As with any other element, * * * identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value." *State v. Taylor*, 9th Dist. Summit No. 27273, 2015-Ohio-403, ¶ 9. Because McCormick limits his sufficiency challenge to the issue of identity, we confine our review to that issue. *See State v. Webb*, 9th Dist. Summit No. 27424, 2015-Ohio-2380, ¶ 6.

{¶8} At the time of his death, the victim and his girlfriend had been dating for several years and had been sharing an apartment for about nine months. Before they began dating, the victim had been romantically involved with J.D., another local woman. The victim's girlfriend testified that she and J.D. had never met in person, but had engaged in online disputes for several years. In the days leading up to the murder, they posted disrespectful messages about each other on social media, and J.D. boasted that she had a new man in her life. A picture that J.D. posted

in response to one of the girlfriend's messages depicted J.D. and her new man, E.A., with two guns lying across his chest.

{¶9} The victim's girlfriend testified that, on the day of his murder, the victim was outside with a local mechanic, whom he had called to fix his car. The car was parked in a small lot just outside their ground-floor apartment. The girlfriend testified that she was inside their apartment when several gunshots rang out. Immediately running outside, she saw the victim lying on the ground and three men running away. As she screamed at them, one turned his face toward her, and she was able to recognize him as E.A. The girlfriend did not recognize the other two men and never saw a gun. Yet, she noticed that two of the men had on dark colors and the third had on a red sweatshirt. She could not recall which color E.A. was wearing, but grabbed her phone and showed the mechanic the picture of E.A. that J.D. had posted a few days earlier. The mechanic confirmed that E.A. had approached the victim and had argued with him about a female. He also indicated, however, that E.A. was not the man who had shot the victim. The mechanic told the girlfriend that the shooter was the man standing behind E.A.

{¶10} The mechanic testified that he had been working on the victim's car for a few hours when the shooting occurred. As he was gathering his tools, three men walked up and one of them, who was dressed in red or orange, began speaking with the victim about things that had been posted on social media. The two other men were dressed primarily in darker colors, but the mechanic denied having gotten a good look at their faces. He testified that, as he was walking to his vehicle with his tools, he heard several gunshots, dropped down, and ran. As he ran, he glanced back and saw that one of the men had a gun. The mechanic testified that the man with the gun was the tallest of the three and was not the man dressed in orange/red. The State then showed the mechanic a still photograph taken from a surveillance video at another apartment

complex. The photograph captured three men, one of whom had on an orange/red sweatshirt and two of whom were trailing behind him. Other witnesses confirmed that third man in the photograph, who was wearing blue jeans beneath a dark jacket, was McCormick. After reviewing the photograph, the mechanic stated that the third man (McCormick) was the one he saw holding the gun.

{¶11} Officer Jeffrey Lamm began responding to the scene of the shooting when dispatch reported it. He also learned from dispatch, however, that he should be on the lookout for a blue minivan and a man wearing an orange hat, as both were potentially linked to the shooting. As he was nearing the area of the shooting, Officer Lamm spotted a blue minivan with an orange hat lying on its center console. Accordingly, he activated his lights and stopped it. Within seconds of the minivan stopping, a man in blue jeans and a dark, puffy coat darted out and ran off. Although Officer Lamm attempted to follow the man in his cruiser, he abandoned his effort when he came to a dead-end street. He then turned around and returned to the minivan. Inside, he found an older gentleman, his wife, and E.A.

{¶12} E.A. testified that, on the day of the shooting, two older friends gave him, McCormick, and a third male, M.G., a ride to the victim's apartment complex in their minivan. E.A. had other business there that day, but decided to talk to the victim when he happened to see him outside. According to E.A., McCormick was behind him on his left-hand side as he spoke with the victim and M.G. was behind him on his right-hand side. He testified that his conversation with the victim was just getting heated when gunshots rang out from his left-hand side. He, McCormick, and M.G. then fled and returned to the minivan. E.A. denied shooting the victim himself and further denied that M.G. could have been the shooter. Though he never affirmatively testified that McCormick was the shooter, he stated that he was "disgusted" when

he returned to the minivan because he felt McCormick had betrayed him, the shooting was not supposed to have occurred, and it "put people in positions people shouldn't have been in." Moreover, when asked why McCormick had shot the victim, E.A. did not deny that he had. Instead, he testified: "No reason. He wanted a name. He wanted everybody to know who he was." He confirmed that McCormick ran from the minivan when a police officer stopped it, and M.G. walked away when the officer left to chase McCormick. E.A. testified that he remained in the minivan because he had nothing to hide and no reason to run.

{¶13} J.D., the woman who was romantically involved with E.A., testified that she was at home with him the morning of the shooting. In the early afternoon, McCormick and M.G. arrived at her apartment and stayed for a short while before the three men left together. J.D. confirmed that a still photograph taken from the surveillance footage at her apartment building depicted the three men leaving. Specifically, it depicted (1) E.A. in the lead, wearing an orange/red sweatshirt, (2) M.G. following behind him in all black, and (3) McCormick securing the rear in a black jacket and blue jeans.

{¶14} J.D. was still home later in the day when someone started pounding on her door. When she opened it, M.G. ran inside followed closely behind by McCormick. The two men did not say anything to J.D., but began pacing around the room. After a few minutes, they went upstairs and removed their hooded sweatshirts. Additionally, M.G. removed his shoes. According to J.D., McCormick asked her for bleach, but she did not have any. The men then left without taking the sweatshirts or the shoes.

{¶15} E.A. testified that, the following day, he took the two sweatshirts and the shoes from J.D.'s apartment and brought them to his grandmother's house. The police then collected the items once E.A. told them where they could be found. Forensic testing confirmed the

presence of gunshot residue on the cuffs of both sweatshirts. Additionally, DNA testing confirmed the presence of male DNA on each sweatshirt, with the profile on one sweatshirt being consistent with McCormick and the profile on the second sweatshirt being consistent with M.G. Though gunshot residue was found on both sweatshirts, experts testified that gunshot residue can settle on anyone in close proximity to a shooting. They further testified that gunshot residue can be transferred between articles of clothing when they are stored together.

{¶16} The police recovered five shell casings from the murder scene, and there was testimony that all five casings were .40 caliber Smith and Wessons. A forensic scientist examined the casings and determined that all five had been fired from the same gun. Though the police never located the gun, they did uncover ammunition and a partially loaded magazine when they executed a search at McCormick's residence. The partially loaded magazine was a Smith and Wesson, and the bullets it contained were .40 caliber Smith and Wesson rounds. The police also found many more rounds for a semiautomatic assault rifle.

{¶17} Former Lieutenant David Laughlin interviewed McCormick a few days after the shooting. He testified that McCormick was not entirely forthcoming during his interview, but did admit that he was present for the shooting and that he ran from the minivan when a police officer stopped it. McCormick told the lieutenant that neither E.A., nor M.G. could have been the shooter because E.A.'s dominant hand had been injured and M.G. had walked away before the shooting had begun. McCormick claimed that he never saw the shooter and that he too had already walked a considerable distance away before the gunshots rang out. He initially failed to tell the police that he went to J.D.'s apartment after the shooting, but reluctantly agreed that he had done so when pressed on that point. Nevertheless, he denied owning or having worn either of the two sweatshirts left at her apartment.

{¶18} McCormick argues that his convictions are based on insufficient evidence because the evidence against him was entirely circumstantial in nature and only showed that he was in the vicinity when the victim was shot. He notes that no one claimed to have witnessed the actual shooting and multiple witnesses gave inconsistent statements at different points in time. Because the State failed to prove his identity as the shooter beyond a reasonable doubt, he argues, he is entitled to a reversal of his convictions.

{¶19} Viewing the evidence in a light most favorable to the State, a rational trier could have concluded that the State proved, beyond a reasonable doubt, that McCormick perpetrated the crimes with which he was charged. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The mechanic who was present when the shooting occurred indicated that the victim was shot by the man matching McCormick's description. E.A. also testified that the bullets came from his left, where McCormick was standing, and theorized that McCormick had shot the victim because he wanted to make a name for himself. The jury heard testimony that McCormick fled from the police, so they could have concluded that his flight evidenced a consciousness of guilt. *See State v. Nichols*, 9th Dist. Summit No. 24900, 2010-Ohio-5737, ¶ 11, quoting *State v. Taylor*, 78 Ohio St.3d 15, 27 (1997). Moreover, they heard testimony that: (1) McCormick removed his sweatshirt at J.D.'s apartment directly after the shooting, (2) he asked her for bleach before leaving the sweatshirt there, (3) his sweatshirt had traces of gunshot residue on its cuffs in spite of his claim that he was already across the street when the shooting occurred, and (4) he had at his residence a partially loaded magazine containing the same brand and caliber of bullets used to kill the victim.

{¶20} Although the evidence against McCormick was circumstantial in nature, the State may prove identity "by direct or circumstantial evidence, which do not differ with respect to

probative value." *Taylor*, 2015-Ohio-403, at ¶ 9. Further, even if the State's witnesses gave inconsistent statements, the question of sufficiency does not concern itself with the resolution of evidentiary conflicts or credibility determinations. *State v. Tucker*, 9th Dist. Medina No. 14CA0047-M, 2015-Ohio-3810, ¶ 7. A sufficiency review calls for an appellate court to view evidence in a light most favorable to the State and to determine only whether the State satisfied its burden of production. *State v. Romes*, 9th Dist. Medina No. 14CA0095-M, 2016-Ohio-5772, ¶ 16. Upon review, McCormick has not shown that the State failed to produce sufficient evidence on the issue of identity. Thus, his first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE VERDICTS IN THIS CASE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

**{¶21}** In his second assignment of error, McCormick argues that his convictions are against the manifest weight of the evidence. We do not agree.

**{¶22}** When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

**{¶23}** In arguing that his convictions are against the manifest weight of the evidence, McCormick once again focuses on the issue of identity. He asserts that the evidence against him was entirely circumstantial and that several witnesses gave inconsistent statements at different

points in time. According to McCormick, the mechanic who identified him as the shooter at trial told the 911 operator that the shooter was wearing an orange hat and a red or orange sweatshirt. The mechanic then later told investigators that the shooter was wearing all black. Because neither of those descriptions matched the attire McCormick was wearing that day, he argues that the jury lost its way when it chose to believe the mechanic's trial testimony. Likewise, he argues that the jury lost its way when it chose to believe E.A. He notes that it was E.A. who argued with the victim and who was romantically involved with his former girlfriend. He also notes that there was evidence E.A. sought favorable treatment in a pending criminal case in exchange for his information.

{¶24} Having reviewed the record, we cannot conclude that the jury lost its way when it found McCormick guilty of his crimes. As we have repeatedly held, the jury "is in the best position to determine the credibility of witnesses," *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15, and "'is free to believe all, part, or none of the testimony of each witness.'" *State v. Clark*, 9th Dist. Wayne No. 14AP0002, 2015-Ohio-2978, ¶ 24, quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. The mechanic who testified said that the man he saw holding a gun was the tallest of the three men he saw and was not the one dressed in orange/red. He also identified McCormick as the shooter when he reviewed a still photograph of the three men. To the extent he gave the 911 operator or the police certain inconsistent details about the shooter's attire or complexion, the jurors were in the best position to judge his credibility. *See Johnson* at ¶ 15. Likewise, they were in the best position to determine whether E.A. was a credible witness. *See id.* The officers who testified confirmed that E.A. was never charged in this matter and was never promised any deals in exchange for his information. Unlike McCormick, he did not flee from Officer Lamm

immediately after the shooting. Moreover, McCormick himself informed the police that E.A. could not have been the shooter due to an injury to his dominant hand.

{¶25} This Court cannot conclude that the jury lost its way simply because it chose to believe the State's witnesses over McCormick's version of the events. *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. The jury heard testimony that McCormick was seen with a gun, that he was standing in the spot from which the gunshots were fired, that his sweatshirt tested positive for gunshot residue, and that he had at his residence a partially loaded magazine with bullets that matched the caliber and brand of bullets used to murder the victim. Upon review, this is not the exceptional case where the evidence weighs heavily against McCormick's conviction. *See Otten*, 33 Ohio App.3d at 340. As such, his second assignment of error is overruled.

### III.

{¶26} McCormick's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

DONNA J. CARR
FOR THE COURT

TEODOSIO, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

DONALD R. HICKS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.