[Cite as *State v. Dumas*, 2021-Ohio-1534.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | | C.A. No.     20CA0029-M |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| TYRELL T. DUMAS | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | | CASE No.     19CR0788 |

DECISION AND JOURNAL ENTRY

Dated: May 3, 2021

---

CALLAHAN, Judge.

{¶1} Appellant, Tyrell Dumas, appeals his conviction for aggravated robbery by the Medina County Court of Common Pleas. This Court affirms.

I.

{¶2} On the evening of May 8, 2019, N.J. drove his friend J.H. from his home in Spencer, Ohio to a nearby town to purchase marijuana, which J.H. planned to resell to a contact made by another acquaintance, D.S. When N.J. and J.H. returned to J.H.'s residence, a car was waiting in the driveway. D.S. and another individual—previously unknown to them—exited the vehicle. J.H. attempted to enter his residence through a man door in the garage, but when he realized that he did not have a key and the door was locked, he kicked in the door, damaging the frame. The four men entered the kitchen area of the residence, where the unknown individual was introduced as "Lee." Moments later, "Lee" drew a firearm and demanded the marijuana from J.H. As "Lee" pointed the gun at J.H., N.J. attempted to intercept him. "Lee" struck N.J.'s head with the firearm,

then left the residence, carrying a bag that belonged to J.H. He returned moments later to retrieve his cellular phone, then rode away in the waiting vehicle. D.S., who was previously acquainted with J.H., stayed behind and attempted to render aid to N.J. He ultimately used J.H.'s cellular phone to call his own device, which had been left in the car they arrived in. When the vehicle returned, D.S. left as well.

{¶3} J.H., a minor at the time of the incident, contacted his mother, who returned home from work and called 911. Over the next few days, N.J. and J.H. received information from other individuals that identified "Lee" as Mr. Dumas. Although N.J. initially identified the assailant to police as "Lee," he then, on his own initiative, retrieved photographs from Mr. Dumas' Instagram account, identified him as his assailant, and provided Mr. Dumas' name and Instagram account ID to the officer investigating the incident. The officer in turn showed the photographs to J.H., who also identified Mr. Dumas as the individual introduced as "Lee."

{¶4} Mr. Dumas was charged with aggravated robbery in violation of R.C 2911.01(A)(1) and an accompanying firearm specification. A jury found him guilty of aggravated robbery but not guilty of the firearm specification, and the trial court sentenced him to an indefinite term of seven to ten and one-half years in prison. Mr. Dumas appealed.

II.

**ASSIGNMENT OF ERROR NO. I**

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE JURY VERDICT
OF GUILTY.

{¶5} In his first assignment of error, Mr. Dumas has argued that the evidence at trial was insufficient to support his conviction for aggravated robbery because it did not demonstrate that he was the individual who committed the offense.[1] This Court does not agree.

{¶6} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009–Ohio–6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). For purposes of a sufficiency analysis, this Court must view the evidence in the light most favorable to the State. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. *Id.*

{¶7} Mr. Dumas' sufficiency argument is limited to the adequacy of the evidence demonstrating that he is the individual who committed the offense at issue. The identity of a perpetrator must be proved by the State beyond a reasonable doubt. *State v. Flynn*, 9th Dist. Medina No. 06CA0096-M, 2007-Ohio-6210, ¶ 12. As with any element of an offense, identity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value. *Id. See also State v. Treesh*, 90 Ohio St.3d 460, 485 (2001), citing *Jenks* at paragraph one of the syllabus.

---

[1] Although Mr. Dumas refers to the appropriate legal standards for analyzing the sufficiency and weight of the evidence, his arguments in support of his first and second assignments of error are virtually identical.

{¶8} N.J., who accompanied J.H. on the evening of the incident, testified that two black males followed them into the residence. He identified one as D.S., but he did not know the identity of the other at the time. According to N.J.'s testimony, the men gathered around the kitchen table in J.H.'s home, and J.H. placed his bag and the marijuana on the table. N.J. was uncertain whether the marijuana remained in the bag. N.J. testified that he did not notice that the unknown man carried a firearm until it was pointed toward J.H. He recalled that he grabbed the bag and tried to leave, but the man turned, struck him with the firearm, and retrieved the bag before leaving the house. N.J. testified that after the incident, other individuals provided him with Mr. Dumas' name, which led him to access Mr. Dumas' Instagram page. According to N.J., the photographs that he saw were consistent with the appearance of the gunman. N.J. provided one of the photographs to the police.

{¶9} J.H. testified that he was contacted by a friend, D.S., with a request that he sell marijuana to another individual on the evening in question. J.H. insisted that D.S. accompany the individual to his residence. J.H. noted that the individual wore a gun on his hip in his waistband. Once inside, according to J.H., the man introduced himself as "Lee Coleman." He testified that the individual raised the gun toward his throat and demanded, "'Give me all that shit[.]'" J.H. testified that he did not know the man but emphasized that he looked directly at his face during the confrontation. J.H. recalled the struggle between N.J. and the gunman, and he testified that the individual left without his cellular phone then returned for it, saying, "'I'll shoot this bitch up.'"

{¶10} After J.H. initially spoke with police, he asked mutual friends of D.S. whether they could help him identify the gunman. By the second time that he was interviewed, however, the police had acquired an Instagram photograph of Mr. Dumas from N.J. J.H. testified that the photograph of Mr. Dumas was "clearly" the gunman and reiterated that he had been "staring right

at him." He testified that although Mr. Dumas' appearance was somewhat different at trial, he was certain that Mr. Dumas was the gunman.

{¶11} D.S. testified that he was an acquaintance of both J.H. and Mr. Dumas. According to D.S.'s testimony, he spent the afternoon of May 8, 2019, at the home of Mr. Dumas' cousin smoking marijuana. At some point during the afternoon, Mr. Dumas arrived and asked D.S. whether he knew anyone who could provide him with marijuana. D.S. testified that he contacted J.H., then connected him with Mr. Dumas through Snapchat. He recalled that the two made arrangements for the transaction, but J.H. insisted that he accompany Mr. Dumas. D.S. testified that a third individual drove him and Mr. Dumas to J.H.'s residence, where he, Mr. Dumas, J.H., and N.J. socialized briefly. D.S. noted that Mr. Dumas introduced himself as "Lee" and explained that he went along with the deception. According to D.S., he heard a gun cock, and Mr. Dumas demanded the marijuana. D.S. also described the altercation between Mr. Dumas and N.J. He testified that after Mr. Dumas left, he borrowed a cellular phone to call his own phone, which he had left in the car.

{¶12} During his testimony, D.S. denied that he knew anyone named "Lee Coleman," and he also testified that he did not know the name of the individual who drove him and Mr. Dumas to J.H.'s home. During his redirect examination, however, D.S. testified that the driver, who remained in the vehicle during the incident, was an individual with a name similar to "Lee Coleman." That individual, L.C., later testified.

{¶13} L.C. testified that around the time of the incident, he sometimes provided Mr. Dumas with rides because he owned a car. L.C. recalled the date in question, and he testified that on that occasion, he provided a ride to D.S. and Mr. Dumas. He testified that he was not sure where they went, but that one of those individuals provided him with driving directions. When

they arrived, D.S. and Mr. Dumas went in the house to purchase marijuana, but L.C. stayed behind in the car. L.C. testified that Mr. Dumas returned by himself and they drove away. He recalled that as they drove, a cellular phone in the car rang. L.C. answered the call, spoke with D.S., then returned to J.H.'s residence to pick him up.

{¶14} Mr. Dumas' argument in support of his first assignment of error directs this Court's attention to inconsistencies in the witnesses' testimony, the witnesses' motivations to testify against Mr. Dumas, and purported inadequacies in the police investigation that culminated in Mr. Dumas' arrest. Each of these arguments, however, goes to the weight rather than the sufficiency of the evidence. *See Jenks*, 61 Ohio St.3d at 273. This Court must, instead, view the evidence in the light most favorable to the State. *See Jackson*, 443 U.S. at 319. Viewed from this perspective, the jury could reasonably conclude beyond a reasonable doubt that Mr. Dumas was the perpetrator. *See Jenks* at 273.

{¶15} Mr. Dumas' first assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 2

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF
THE EVIDENCE.

{¶16} Mr. Dumas' second assignment of error is that his conviction for aggravated robbery is against the manifest weight of the evidence because the evidence at trial did not demonstrate that he committed the crime. This Court does not agree.

{¶17} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). As with other elements of a crime, "the credibility of witnesses and their degree of certainty in identifying the defendant are matters affecting the weight of the evidence." *Flynn*, 2007-Ohio-6210, at ¶ 12, citing *State v. Gorgan*, 9th Dist. Medina No. 1824, 1990 WL 1771, *1 (Jan. 10, 1990).

{¶18} N.J. testified that he provided J.H. with a ride on the date in question so that J.H. could obtain marijuana to sell to a third party, but he acknowledged that he kept this information from police when he was interviewed because he did not want to be implicated in a drug offense. N.J. acknowledged that he told police that the gunman was not wearing glasses, and he contradicted that statement during his testimony. He also agreed that he told police that the gunman had "a Bob Marley look to him[,]" but clarified that he "never said that he had long dreads down past his shoulders." N.J. testified that the gunman had piercings in at least one ear that he previously described as "gauges." He also recalled that the assailant's only distinctive clothing was a beanie-type hat that was red, white, and yellow. During trial, N.J. identified Mr. Dumas as the gunman but acknowledged that his appearance had changed significantly: on the date of trial, his hair was shorter, he wore glasses, and he did not have any indications of scarring on his ears consistent with wearing gauges. N.J. also testified that he might have previously told the police that he heard D.S. use the name "Lee" during the incident but explained that "Lee" was "just a name [he] remember[ed] hearing." Nevertheless, N.J. also testified that he obtained pictures from Mr. Dumas' Instagram account shortly after the incident that were taken when his appearance was unchanged. He clarified that his attention was focused primarily on the gun during the incident, which took place during a matter of minutes.

{¶19} Like N.J., J.H. acknowledged that the purpose of the meeting on May 8th was a drug transaction between him and a friend of D.S. whom he had not previously met. He also admitted that he and N.J. had smoked marijuana earlier in the day. J.H. testified that when D.S. set up the drug transaction, he provided J.H. with the Snapchat ID of an individual named "Lee." He also explained that the Snapchat appeared to represent an account that had only recently been created. According to J.H., the man introduced himself in person as "Lee Coleman," and, after the incident, D.S. provided him with a description of where "Lee Coleman" lived.

{¶20} J.H. testified that he noticed the gun in the man's waistband before they entered the house but did not suspect trouble because of his relationship with D.S. J.H. recalled that he looked the gunman in the face from a close proximity. He recalled that the gunman had a red bandana tied around his head and that his hair was styled in short twists. According to J.H., the gunman did not have gauges in his ears, but did wear diamond earrings. He testified that the gunman wore glasses during the incident. Like N.J., J.H. contacted other acquaintances after the incident to inquire about the identity of the individual who accompanied D.S. When those acquaintances suggested Mr. Dumas, J.H. found a photograph of him on social media and noted that "it was clearly him." J.H. testified that police showed him a picture of Mr. Dumas when he was interviewed, but that he had already obtained it on his own by that time. Although he noted that Mr. Dumas' hair and glasses were different at trial, J.H. testified that he "ha[d] no doubt about" identifying Mr. Dumas as the gunman.

{¶21} D.S., who was a friend of both J.H. and Mr. Dumas, facilitated the drug transaction between the two and accompanied Mr. Dumas to J.H.'s home. As he explained during his cross-examination, "your client [Mr. Dumas] needed some weed. He wanted to know if I had some. * * * I told him yeah. I hit up [J.H.]." D.S. acknowledged that he was present during the incident

but lied to the police because he did not want to be implicated. D.S. also acknowledged that he had been charged in connection with the incident and that he was testifying as a result of a plea agreement that required him to do so truthfully. D.S. testified that he spent the afternoon of May 8, 2019, at the home of Mr. Dumas' cousin, where he and a group of acquaintances smoked marijuana. When Mr. Dumas arrived, he asked D.S. if he knew anyone who could provide him with marijuana. D.S. testified that he connected Mr. Dumas with J.H. through Snapchat and that J.H. insisted that D.S. accompany Mr. Dumas during the transaction.

{¶22} During his direct examination, D.S. testified that a third individual drove him and Mr. Dumas to J.H.'s house but remained in the car during the incident. He also testified that he did not remember the driver's name. D.S. recalled that Mr. Dumas introduced himself to J.H. as "Lee," and he admitted that he did not correct that misrepresentation. D.S. testified that he provided the investigators with the name "Lee" because he "wanted to just go home. * * * I was ready to go." He also testified, however, that he eventually identified Mr. Dumas to J.H. after the incident. D.S. recalled that Mr. Dumas had somewhat longer hair at the time and that he was certain it was styled in short dreadlocks. He denied that Mr. Dumas wore gauges in his ears but recalled that he did have earrings.

{¶23} During direct and cross-examination, D.S. testified that to the best of his knowledge, there was no individual named "Lee Coleman." He also denied previous statements to the police to the effect that the driver of the car was named "Lee" and that they left in "Lee's" car. During his redirect examination, however, D.S. changed his testimony. At that point, D.S. testified that the driver of the car was L.C., an individual whose name is phonetically similar to "Lee Coleman." D.S. emphasized that L.C. merely provided a ride to J.H.'s house and had nothing to do with the incident. He acknowledged that his testimony on this point had been false, explained

that he had concealed L.C.'s identity to protect him, and reasoned that his testimony was not entirely dishonest because none of the questions he had been asked referred to L.C. by name. D.S. testified that he had attended school with L.C. when they were younger, but he stated that he had never seen L.C. and Mr. Dumas together. He also described L.C. as "a bigger guy" who was not muscular, and he explained that L.C. wore his hair short in a wave style.

{¶24} After D.S. testified, the State located L.C. and subpoenaed him to appear the following day. L.C. testified that he and Mr. Dumas have mutual friends, and he explained that they met through Mr. Dumas' cousin. He stated that he knows D.S. well and that they attended the same school in the past. L.C. explained that he was one of the only individuals in his previous circle of acquaintances who had a driver's license and a vehicle, so he frequently provided rides to others. Mr. Dumas was one person to whom he provided transportation. L.C. testified that he drove Mr. Dumas to his girlfriend's residence at times and that, on a few occasions, he drove Mr. Dumas somewhere to purchase marijuana. L.C. also explained, however, that he had on a previous occasion refused to give Mr. Dumas a ride because he suspected that Mr. Dumas was going to engage in other criminal activity.

{¶25} L.C. recalled that he gave D.S. and Mr. Dumas a ride to get some marijuana around the date of the incident. He did not remember the date, but he did remember that it was warm outside. L.C. testified that he did not know where they were going; either Mr. Dumas or D.S. gave him directions. When they arrived, L.C. stayed in the car while Mr. Dumas and D.S. went inside. He recalled that Mr. Dumas returned to the car, but D.S. did not. L.C. testified that he believed he asked about D.S. and that Mr. Dumas explained that he was staying behind because the house belonged to a friend. L.C. testified that as they drove back in the direction they had come, a cellular phone rang in the car. He recalled that he located and answered the phone, which belonged to

D.S., then drove back to the residence to pick D.S. up. L.C. emphasized that he never learned what happened inside the house, but he explained that he was aware that something must have happened: "The energy was off. It was a whole different atmosphere on the way back. * * * Sort of the vibe. Just the vibe in the car, it wasn't the same. It felt like a lot of tension."

{¶26} L.C. identified Mr. Dumas in court and explained that at the time of the incident, his hair was longer and styled in twists. He did not recall if Mr. Dumas wore anything on his head that evening, wore glasses, or wore earrings. He had, however, seen Mr. Dumas wearing diamond earrings in the past. L.C. testified that, to the best of his knowledge, Mr. Dumas never wore gauges in his ears; he also explained that he himself did not do so. L.C. testified that his own hair was styled in a wave, which had been his hairstyle since eighth grade. L.C. also testified that he is five feet, nine inches tall and weighs approximately 312 pounds.

{¶27} L.C. testified that he had not been previously contacted by investigators regarding the incident and that he had been subpoenaed only the day before. He explained that he does sometimes go by the nickname "Lee," but he testified that he had not been aware that his name had been given to police previously. L.C. also testified that he had limited contact with the individuals involved since the incident because he had determined to give up marijuana and change his lifestyle. To that end, L.C. testified, he had cut off contact with his previous acquaintances, gotten rid of his cellular phone, obtained full-time employment, and engaged in volunteer activities through his church.

{¶28} Mr. Dumas' girlfriend, A.W., testified on his behalf. A.W. explained that around the date of the incident, Mr. Dumas wore his hair longer, styled in "little tiny curls," and had diamond earrings. A.W. testified that she remembered May 8, 2019, distinctly because she experienced a death in the family on that date. She explained that she spent the entire day with

Mr. Dumas, who helped her to care for her aged grandmother. During her direct examination, she testified that Mr. Dumas had not contacted her about the case, nor had he made any attempt to influence her. On cross-examination, however, A.W. admitted that her testimony on those points was false: she acknowledged that Mr. Dumas had contacted her by telephone on several occasions to discuss the case and that information about other witnesses' testimony had been relayed to her through an individual in the gallery. A.W. testified that her memory about those recent conversations was poor, yet she insisted that she could remember specific details related to the date of the incident.

{¶29} Sergeant Douglas Meredith of the Spencer Police Department responded to J.H.'s residence after the incident along with several Medina County Sheriff deputies. He testified that the kitchen had adequate lighting and he had no difficulty seeing the room. According to Sergeant Meredith, there was little evidence to be seen and none to collect from the crime scene. Based on the statements provided to him, he determined that it would not be fruitful to collect trace evidence.

{¶30} Sergeant Meredith testified that both N.J. and D.S. provided the name "Lee Coleman." He explained that he attempted to identify that individual through OLEG but did not meet with success. Within about an hour of his initial interview, however, he testified that N.J. contacted him and provided Mr. Dumas' name and Instagram ID. Sergeant Meredith obtained a photograph of Mr. Dumas using that information. He explained that N.J. was certain that the individual in the photograph was the gunman. When he interviewed J.H. in June, J.H. also provided Mr. Dumas' name and confirmed that the photograph depicted Mr. Dumas. Sergeant Meredith no longer had access to that photograph when he testified, but he recalled that it depicted Mr. Dumas with a different hair style, glasses, and larger earrings that Sergeant Meredith did not characterize as gauges. Sergeant Meredith explained that he did not conduct a photo array with

the witnesses because Mr. Dumas' identity had been provided by them and, under those circumstances, a photo array would not have made sense.

{¶31} Mr. Dumas argues that his conviction is against the manifest weight of the evidence because the evidence that identified him as the gunman is untrustworthy. Specifically, he argues that the witnesses' testimony was riddled with inconsistency and, at times, obviously false. In that respect, he notes that D.S., who was charged with the same crime, had a strong motive to provide false testimony. Mr. Dumas correctly points out that the testimony of N.J., J.H., and D.S. was inconsistent at various points. N.J., for example, testified that Mr. Dumas may have worn gauges in his ears on the night of the incident. The other witnesses disagreed. Notably, however, they all agreed that Mr. Dumas may have been wearing earrings, and some agreed in their testimony that they may have had the appearance of diamond earrings. The witnesses differed in their recollection of whether Mr. Dumas wore glasses. A.W., although testifying in Mr. Dumas' defense, confirmed that Mr. Dumas wore glasses and frequently wore diamond earrings around that time. Similarly, Mr. Dumas points to N.J.'s description of Mr. Dumas' hairstyle as an inconsistency. His testimony on that point, however, appears to reflect a difference in word choice rather than substance: other witnesses confirmed that around the time of the incident, Mr. Dumas wore his hair in short twists that were consistent with N.J.'s testimony. Undoubtedly, the eyewitnesses to the incident had motives to conceal their own involvement and, in fact, had provided dishonest statements to the police on previous occasions. Nonetheless, the details of their testimony with respect to the identification of Mr. Dumas corresponded. The testimony of L.C., who had no involvement in the investigation prior to his last-minute subpoena, confirmed many of the details that others provided.

{¶32} With respect to the testimony of Sergeant Meredith, Mr. Dumas maintains that the investigation of the crime scene was insufficient. Sergeant Meredith testified, however, that his

investigation was appropriate for the nature of the crime scene and explained that the collection of trace evidence would not have been his practice under the circumstances. James Cartwright, an investigator from the Medina County Prosecutor's Office who assisted with the investigation, agreed with Sergeant Meredith's assessment.

{¶33} Given the testimony at trial, we cannot conclude that this is the exceptional case in which the evidence weighs heavily against the conviction. *See Otten*, 33 Ohio App.3d at 340, citing *Martin*, 20 Ohio App.3d at 175. Mr. Dumas' second assignment of error is overruled.

III.

{¶34} Mr. Dumas' assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

CARR, P. J.
TEODOSIO, J.
CONCUR.


APPEARANCES:

ERIC D. HALL, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Proseuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.