[Cite as *State v. Black*, 2024-Ohio-1206.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 30567 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ADARUS BLACK | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 22 08 2751 |

DECISION AND JOURNAL ENTRY

Dated: March 29, 2024

FLAGG LANZINGER, Judge.

**{¶1}** Defendant-Appellant, Adarus Black, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** N.C. was only eighteen years old when she fell victim to a drive-by shooting. She was driving her grandmother home from running errands. Their car stopped at the intersection of North Street and Howard Street. Gunfire erupted. N.C. sustained multiple gunshot wounds. She later died at the hospital. Her grandmother survived the shooting but did not see who shot N.C.

**{¶3}** Investigators determined that someone in a black, Chevy Camaro perpetrated the shooting. The car had a custom-designed wrap across its hood. After the police issued a press release, they received a lead about the car. Their investigative efforts ultimately yielded two suspects: the driver of the car and Black.

{¶4} The driver of the car and Black shared a half-sister. They slept at her apartment the night before the shooting and attended a party together the day of the shooting. The driver of the car brought the Camaro to the party. Witnesses saw the two men leave the party together. Witnesses later saw the two men return to the party. The shooting occurred while the two men were absent from the party. Recorded footage from the Akron area showed the driver of the Camaro stopping at a clothing store near Highland Square. It also showed the Camaro follow N.C.'s car and drive past it at the intersection where she was shot. The trajectory of the bullets that struck her car, the location of the casings the police found in the street, and the investigation they conducted led the police to conclude that Black shot N.C. while riding in the front passenger's seat of the Camaro.

{¶5} The police issued a warrant for Black's arrest. The warrant remained active for 19 months as the police searched for him. Finally, the fugitive task force successfully tracked him to an apartment in Georgia. At the time of his arrest, Black was armed with an AK-47. He also was carrying a California identification card bearing his picture and a false name.

{¶6} Black was indicted on one count of murder with an attendant firearm specification. A jury found him guilty. The trial court sentenced him to a total of 18 years to life in prison.

{¶7} Black now appeals from his conviction and raises three assignments of error for review. To facilitate our review, we reorder his assignments of error.

II.

ASSIGNMENT OF ERROR II

APPELLANT'S CONVICTION WAS BASED UPON INSUFFICIENT
EVIDENCE TO SUSTAIN CONVICTION. THE TRIAL COURT ERRED BY
DENYING APPELLANT'S CRIM.R. 29 MOTION.

{¶8} In his second assignment of error, Black argues his conviction is based on insufficient evidence. We disagree.

{¶9} This Court reviews the denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence. *State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 33. Whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶10} Black's sufficiency argument is limited to the issue of identity. He argues that the State failed to prove he was the individual who shot N.C. In analyzing the sufficiency of the evidence, we tailor our review to his limited argument.

{¶11} "The identity of a perpetrator must be proved by the State beyond a reasonable doubt." *State v. Dumas*, 9th Dist. Medina No. 20CA0029-M, 2021-Ohio-1534, ¶ 7. "Like any other element of an offense, identity may be established through direct or circumstantial evidence." *State v. Jackson*, 9th Dist. Summit No. 28192, 2017-Ohio-635, ¶ 7.

{¶12} N.C.'s grandmother testified that N.C. received a car as a high school graduation present. On the afternoon of her murder, N.C. agreed to drive her grandmother to the bank. The two stopped at a bank on West Market. On their way home, they also stopped at a gas station to make a purchase from its drive-thru. The grandmother testified that they were waiting at a red

light at the intersection of North Street and Howard Street when gunfire erupted. N.C. sustained multiple gunshot wounds. Because the grandmother was focused on N.C., she never saw the shooter.

{¶13} Former Detective Michael Shaffer testified that he responded to the scene of the shooting. The police found eight shell casings in the street and several bullet holes in the driver's side of N.C.'s car. Detective Shaffer testified that another bullet made an indentation when it skidded off the middle of the car's hood and struck the windshield. Several officers, including Detective Shaffer, testified that the trajectory of that bullet was consistent with it having been fired from the front of N.C.'s car rather than the side. The nature of the bullet damage to N.C.'s car and location of the casings on the street caused the police to suspect N.C. had been shot in a drive-by shooting.

{¶14} Detective Shaffer testified that a single witness at the scene believed N.C. had been shot by someone in a black car. The police were able to secure surveillance footage from a nearby business, as well as many other security cameras in the surrounding area. Their investigative efforts led them to conclude that whoever perpetrated the shooting had been seated inside a black, Chevy Camaro with a distinctive wrap on the hood. Detective Shaffer testified that the police department issued a press release, seeking information about the car.

{¶15} Following the press release, the police received a lead about the Camaro. Detective Shaffer and Detective Anthony Starvaggi testified that the lead caused them to speak to a female at an apartment building in Tallmadge. The State set forth evidence that the female was Black's half-sister. The half-sister admitted that Black and his girlfriend had stayed at her apartment the night before the shooting. Yet, she initially denied knowing anything about the Camaro. The half-

sister called Black on the phone while the detectives were there and placed the call on speakerphone. Black also claimed he did not know anything about the Camaro.

{¶16} Detective Bertina King testified that Black's half-sister had another half-brother apart from Black. A few days after the shooting, the other half-brother, J.B., had his attorney contact Detective King to schedule an interview. Detective King and Detective Shaffer met with J.B. at the police station. The police identified him as the driver of the Camaro. They also learned the location of the car. Special Agent Christopher Fasler of the FBI assisted the Akron Police Department in recovering the car. He testified that he found the car abandoned on a street in Cleveland. When he found the car, it was unlocked and only remnants of the distinctive wrap on its hood remained.

{¶17} Detective King testified that J.B.'s interview caused the police to focus on him and Black as the primary suspects in the shooting.[1] Shortly after J.B.'s interview, the half-sister came to the police station to speak with Detective King and Detective Shaffer. The half-sister altered her initial statement at that interview and, as a result, was charged with obstructing. The State later offered her immunity from prosecution in exchange for her testimony.

{¶18} The half-sister testified that both Black and J.B. were her half-brothers, although the two men were not blood relations. The night before the shooting, Black and his girlfriend stayed at her apartment along with J.B. The half-sister confirmed that J.B. drove the black Camaro and brought it to her apartment when he spent the night there. She testified that she initially lied to the police about the car because she did not want anyone to get in trouble.

---

[1] J.B. did not testify because he passed away before trial. Accordingly, the State was not permitted to introduce any of the actual statements he made to the police.

{¶19} The State set forth evidence that J.B. purchased the black Camaro from its former owner about a week before the shooting. The former owner testified that he knew J.B. through a friend. The day of the shooting, the former owner was celebrating his birthday at a house on Merton Avenue. He indicated that the festivities began in the morning and continued throughout the day. The former owner testified that J.B. came to the party in the Camaro. While he refused to testify that he saw J.B. and another man arrive together in the car, he agreed J.B. was at the party with another man. He believed the man was J.B.'s brother. He testified that he only knew the man by nickname, but he identified the man as Black while testifying. He indicated that he had seen Black a few times before the party. On each of those occasions, Black had been with J.B.

{¶20} The former owner testified that, at some point, he told J.B. to leave the party and go buy him a t-shirt. At trial, he claimed he could not recall Black's whereabouts around that time. He admitted, however, that he spoke with the police eleven days after the shooting. The State asked him about his interview statements. The former owner admitted that he told the police J.B. and Black left together by themselves to get the t-shirt and later returned to the house together by themselves.

{¶21} A friend of the former owner also testified at trial. He testified that he attended the former owner's birthday party. He knew J.B. from around the neighborhood and knew he had purchased the former owner's Camaro. The friend testified that he saw J.B. and the Camaro at the party. J.B. was with another man, but the friend did not know who the man was. The friend testified that J.B. left the party with the man because the former owner sent J.B. to a store on West Market to purchase a t-shirt. J.B. and the man later returned with the t-shirt. The friend testified that the two remained at the party for a while. He believed the two eventually left the party together.

{¶22} The State produced a recording of J.B. purchasing a t-shirt at a store on West Market shortly before the shooting. After he purchased the t-shirt, J.B. entered the driver's seat of the Camaro and began driving away from the store. Recordings the police obtained from a variety of stores, outside cameras, and private residences allowed them to track the movements of the Camaro and N.C.'s car. Detective Starvaggi explained how investigators determined that the Camaro became interested in a third car that was the same color and make as N.C.'s car. That third car entered the gas station drive-thru directly in front of N.C.'s car. Meanwhile, the Camaro bypassed the gas station, stopped in a parking lot to the east, and backed into a parking space. When the third car emerged from the drive-thru, it proceeded west on West Market. N.C. then emerged from the drive-thru, proceeded east, and turned onto North Street. The Camaro left its parking space immediately thereafter and eventually followed N.C.'s vehicle to the intersection of North Street and Howard Street.

{¶23} Lieutenant David Whiddon testified as the lead investigator in this matter. He testified that the police never believed the driver of the Camaro shot N.C. Rather, the police surmised that two individuals were involved in the shooting, and the front seat passenger fired the shots that killed N.C.

{¶24} During his testimony, Detective Shaffer explained why the evidence supported the conclusion that the front seat passenger killed N.C. Recorded footage showed the Camaro pulling alongside N.C.'s car without stopping and continuing to move east as the shooting occurred. There also was testimony that all eight of the casings the police found in the street had been fired from the same gun. Detective Shaffer testified that, had the driver of the Camaro fired those shots across the car, most of the casings would have remained inside the car instead of on the road. Moreover, the trajectory of the shots was such that, had the driver fired them, the driver eventually would

have struck the inside of the Camaro. According to Detective Shaffer, the evidence supported the conclusion that the front seat passenger placed his hand out of the Camaro, began firing at N.C.'s car, and continued firing at a backward angle as the Camaro overtook the car and continued east on North Street.

{¶25} After the police department issued a warrant for Black's arrest, detectives were unable to locate him. The department ultimately enlisted the services of the fugitive task force. Detective Troy Meech, a task force member, testified that the task force searched for Black for about 19 months. They finally found him at an apartment in Georgia. When they arrested him, he had an AK-47 pistol tucked into his pants. He also had a California identification card bearing his picture and a false name. Black refused to answer when an officer asked him his name. Instead, he said "you got me." When Detective Meech told Black that they had been looking for him for a long time, Black said, "I'm just glad it's over."

{¶26} Black had a cell phone on him at the time of his arrest. The police department also linked several other cell phone numbers to him. Adam Mosher, the cofounder of Global Intelligence and creator of Cybercheck, testified that the police department hired him to analyze each of Black's phone numbers. He explained that Cybercheck is a law enforcement tool that can target an individual's location based on his or her cyber profile. Cybercheck builds a cyber profile for an individual based on identifiers like an individual's email address, social media accounts, and similar web-based applications. According to Mosher, smartphone applications are constantly searching and attempting to connect to open wireless sources. Those open wireless sources have physical locations. Thus, Cybercheck uses attempted connections in conjunction with a person's cyber profile to generate a physical location for the individual. Mosher testified that, unlike traditional cellphone technology, Cybercheck can uncover an individual's location without having

their cell phone subscriber information. Accordingly, the technology works even on prepaid phones for which no subscriber information is available.

{¶27} Mosher testified that he used Cybercheck to analyze Black's physical location around the time of the murder. He also analyzed J.B.'s location around that same time. His report showed that the cyber profiles his technology linked to Black and J.B. were together at the party at Merton Avenue before the shooting, were together near the intersection of North Street and Howard Street at the time of the shooting, and were together at Merton Avenue after the shooting.

{¶28} Initially, this Court notes that Black has challenged the admission of Mosher's testimony in a separate assignment of error. When analyzing the sufficiency of the evidence, "[t]his Court must consider all of the evidence presented by the State * * * regardless of whether the evidence was properly admitted." *State v. Kerik*, 9th Dist. Summit No. 30539, 2023-Ohio-3455, ¶ 15. Accordingly, Black's challenge to Mosher's testimony is not a factor in this Court's sufficiency review.

{¶29} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved, beyond a reasonable doubt, that Black was the individual who shot N.C. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The evidence showed that Black and J.B. shared a half-sister and were together at her apartment the morning of the shooting. People saw them together at a party shortly before the shooting. Further, there was evidence that the two left the party together to buy a t-shirt and later returned to the party together with the t-shirt. The evidence showed J.B. was driving the Camaro involved in the shooting. The State also presented circumstantial evidence tending to show that his front seat passenger shot N.C. Following the shooting, Black fled the Akron area and remained on the run for over a year and a half. He was arrested with a firearm and fake identification. While being

arrested, he told the police that they "got" him and that he was glad their search for him was over. Upon review, Black has not shown that the State set for insufficient evidence of his identity as the perpetrator. Accordingly, his first assignment of error is overruled.

ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED PLAIN ERROR BY ADMITTING THE TESTIMONY OF ADAM MOSHER AND THE SUPPOSED CYBERCHECK REPORT AS EXPERT EVIDENCE OF MR. BLACK'S LOCATION ON THE DATE OF THE OFFENSE.

**{¶30}** In his first assignment of error, Black argues the trial court committed plain error when it allowed Adam Mosher to testify as an expert witness for the State. Upon review, we reject his argument.

**{¶31}** "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

By its very terms, [Crim.R. 52(B)] places three limitations on a reviewing court's decision to correct an error that was not raised below. First, an error, i.e., a deviation from a legal rule, must have occurred. Second, the error complained of must be plain – that is, it must be an obvious defect in the * * * proceedings. Third, the error must have affected substantial rights. We have interpreted this * * * to mean that the trial court's error must have affected the outcome of the proceedings.

(Alterations sic.) *State v. Harris*, 9th Dist. Summit No. 29583, 2020-Ohio-4365, ¶ 19, quoting *State v. Martin*, 154 Ohio St.3d 513, 2018-Ohio-3226, ¶ 28.

**{¶32}** As previously noted, Mosher testified about Cybercheck, a law enforcement tool his company developed to help track individuals through their cyber profiles. Black claims Mosher offered conclusions based on technology and methods that have not been tested to a reasonable degree of scientific certainty. He argues that Mosher's testimony did not satisfy the strictures of Evid.R. 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). According

to Black, that unreliable testimony was the only evidence connecting him to the location of the shooting. Thus, he argues the trial court committed plain error by admitting it.

**{¶33}** Assuming without deciding that Mosher's testimony was improper, Black has not shown that its admission resulted in plain error. Plain error will lie only if a trial court's error affected the outcome of the proceedings. *Harris* at ¶ 19, quoting *Martin* at ¶ 28. The record does not support Black's argument that Mosher's testimony was the only evidence linking him to the location of the shooting. As previously noted, the State produced other circumstantial evidence showing Black was the shooter. *See Jenks*, 61 Ohio St.3d 259, paragraph one of the syllabus (direct and circumstantial evidence have the same probative value). Black accompanied J.B. to a party directly before the shooting. He was seen leaving with J.B. when J.B. took his Camaro to buy a t-shirt, and the two returned to the party together after the shooting. J.B. was driving the Camaro, but the evidence supported the conclusion that his front seat passenger perpetrated the shooting. A series of recordings tracked much of the car's progress following its departure from the t-shirt store. There was no evidence to suggest J.B. picked up a third-party during that journey. Further, following the shooting, Black fled from the state and evaded capture for almost 19 months. *See State v. McCormick*, 9th Dist. Summit No. 29121, 2019-Ohio-2204, ¶ 19 (flight may be considered as consciousness of guilt). Black has not shown that, but for the admission of Mosher's testimony, the outcome of his trial court would have been different. *See State v. Knight*, 9th Dist. Wayne No. 15AP0019, 2016-Ohio-8505, ¶ 14. Accordingly, his first assignment of error is overruled.

ASSIGNMENT OF ERROR III

THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶34}  In his third assignment of error, Black argues his conviction is against the manifest weight of the evidence.  We do not agree.

{¶35}  When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction."  *State v. Croghan*, 9th Dist. Summit No. 29290, 2019-Ohio-3970, ¶ 26.  This Court "will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version."  *State v. Warren*, 9th Dist. Summit No. 29455, 2020-Ohio-6990, ¶ 25, quoting *State v. Tolliver*, 9th Dist. Lorain No. 16CA010986, 2017-Ohio-4214, ¶ 15.

{¶36}  Black acknowledges his manifest weight argument is "largely duplicative" of his sufficiency argument.  He claims the jury lost its way in convicting him because there was not enough evidence linking him to the shooting.  He notes that no witnesses ever saw him in the Camaro, there was no recorded footage of him in the car, and his DNA was never found inside it.  He also notes that his half-sister testified that he did not have a personal cell phone.  According to Black, her testimony undercut the State's evidence regarding any cell phone numbers the State allegedly linked to him and provided to Mosher for analysis.

{¶37} Detective Shaffer admitted that the police were unable to find any DNA profiles consistent with Black's profile inside the Camaro. He also testified, however, that the police were unable to find *any* DNA profiles inside the car. Although recorded evidence showed J.B. entering the car and driving it, even J.B.'s DNA's profile was absent when the police swabbed the car. There was testimony that DNA inside the car could have been removed if someone wiped down the car before abandoning it.

{¶38} Black's half-sister did testify that Black did not have a personal cell phone. Yet, the jury heard testimony that he had a cell phone on his person when the police arrested him. That phone number was one of the numbers the State provided Mosher when he conducted his analysis. Further, as noted, the Cybercheck report Mosher generated based on Black's phone numbers was not the only evidence the State produced to link Black to the murder.

{¶39} Having reviewed the record, we cannot conclude that this is the exceptional case where the evidence weighs heavily against Black's convictions. *See Croghan*, 2019-Ohio-3970, at ¶ 26. The State theorized that Black shot N.C. from the passenger's seat of J.B.'s Camaro while J.B. drove them past her car. As noted, the evidence placed Black with J.B. at a party directly before the shooting. Circumstantial evidence showed Black then accompanied J.B. to purchase a t-shirt and returned to the party with him after the murder. The jury reasonably could have chosen to believe the State's theory that Black perpetrated the shooting, particularly after he fled from justice. *See McCormick*, 2019-Ohio-2204, at ¶ 19. As noted, a conviction is not against the manifest weight of the evidence "simply because the trier of fact chose to believe the State's version of events over another version." *Warren*, 2020-Ohio-6990, at ¶ 25, quoting *Tolliver*, 2017-Ohio-4214, at ¶ 15. Black has not shown that the jury lost its way by convicting him. Accordingly, his third assignment of error is overruled.

III.

{¶40} Black's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JILL FLAGG LANZINGER
FOR THE COURT

CARR, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.